# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### SOUTHERN DIVISION

No. 7:13-CV-00132-RJ

| | |
|---|---|
| ARTHUR TIMOTHY CALLAHAN, | ) |
| | ) |
| Plaintiff/Claimant, | ) |
| | ) |
| | ) |
| v. | ) ORDER |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

This matter is before the court on the parties' cross motions for judgment on the pleadings [DE-34, -39] pursuant to Fed. R. Civ. P. 12(c). Claimant Arthur Timothy Callahan ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of his applications for a period of disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") payments. The time for filing responsive briefs has expired, and the pending motions are ripe for adjudication. The parties have consented to the jurisdiction of a magistrate judge [DE-22], and the cross motions are considered here pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, Claimant's Motion for Judgment on the Pleadings will be denied and Defendant's Motion for Judgment on the Pleadings will be allowed, upholding the final decision of the Commissioner.

## I. STATEMENT OF THE CASE

Claimant protectively filed applications for a period of disability, DIB, and SSI on October 22, 2009, alleging disability beginning September 1, 2008. (R. 31, 199-204, 223-224). His claims

were denied initially on February 10, 2010, and upon reconsideration on August 14, 2010. (R. 78-139). A hearing before Administrative Law Judge ("ALJ") Richard Vogel was held on December 16, 2011, at which Claimant, who was represented by counsel, and a witness appeared and testified. (R. 46-77). On January 20, 2012, the ALJ issued a decision denying Claimant's request for benefits. (R. 28-45). Claimant requested a review of the ALJ's decision by the Appeals Council, which was denied on April 24, 2013. (R. 1-6). Claimant then filed a complaint in this court seeking review of the now final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial

2

evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. §§ 404.1520 and 416.920:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. §§ 404.1520a(b)-(c) and 416.920a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* §§ 404.1520a(e)(3), 416.920a(e)(3).

3

In this case, Claimant alleges the ALJ erred by (1) failing to evaluate Claimant's depression and failing to make findings of any nonexertional limitations relative to this disorder; (2) failing to evaluate Claimant's back injury under Listing 1.04; and (3) failing to properly consider the medical opinions. Pl.'s Mem. [DE-35] at 13-25.

## IV. FACTUAL HISTORY

### A. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant has not engaged in substantial gainful employment since the alleged onset date. (R. 33). Next, the ALJ determined Claimant has the severe impairments of degenerative disc disease and depression. *Id.* However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* Applying the special technique prescribed by the regulations, the ALJ found that Claimant has no restriction in his activities of daily living, mild restrictions in social functioning, mild-to-moderate restrictions maintaining concentration, persistence or pace, and no episodes of decompensation of an extended duration. (R. 34).

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform sedentary work,[1] specifically that Claimant "is able to lift and carry up to 10

---

[1] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. §§ 404.1567(a), 416.967(a); SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996). "Occasionally" generally totals no more than about 2 hours of an 8-hour workday. "Sitting" generally totals about 6 hours of an 8-hour workday. SSR 96-9p, 1996 WL 374185, at *3. A full range of sedentary work includes all or substantially all of the approximately 200 unskilled sedentary occupations administratively noticed in 20 C.F.R. § 404, Subpt. P, App. 2, Table 1. *Id.*

4

pounds occasionally and lesser amounts frequently, sit for six hours in an eight-hour day, and stand and walk occasionally. However, the claimant cannot perform any climbing or crawling, and can only occasionally crouch and stoop." (R. 35). In making this assessment, the ALJ found Claimant's statements about his limitations not fully credible. (R. 36). At step four, the ALJ concluded Claimant is not capable of performing his past relevant work. (R. 40). Despite this finding the ALJ alternatively determined at step five, upon considering Claimant's age, education, work experience and RFC, that Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 40-41).

## B. Claimant's Testimony at the Administrative Hearing

At the time of Claimant's December 16, 2011 administrative hearing, Claimant was 46 years old, divorced, and living with his thirteen-year-old son, his mother, and his nephew. (R. 48-49). Claimant quit high school and obtained a GED. (R. 49). Claimant previously worked in construction, but had not worked since September 2008 and had no source of income. *Id.*

Claimant explained numerous medical conditions supporting his disability claim and inability to work. Claimant began experiencing back problems after an automobile accident in 1992, but he was able to continue working until he was involved in second automobile accident in 2008, after which he could no longer tolerate the pain. (R. 50). Claimant has been diagnosed with herniated discs in his back and his doctors indicated surgery may or may not be helpful and would limit his ability to bend, so Claimant has not pursued surgical options. (R. 50-51). Instead, Claimant opted to treat his pain with medicine and to continue as best he could, and Claimant was able to work for a period of time despite his pain. (R. 51).

Claimant's doctor had recently taken him off many of his medications, including his pain

5

medicine, while waiting for him to be admitted into a pain management practice. (R. 51-52). Claimant was previously in a pain management program, but could not afford to travel to attend the required group therapy three times a week and was terminated. (R. 59). Claimant admitted he is addicted to pain medicine, explaining that as his different medications were increased, his body built an immunity to the medicine. *Id.* Claimant was feeling ill at the hearing due to either withdrawal from his pain medication or the flu. (R. 52-53). He had been in withdrawal for several months because when the pain becomes unbearable he takes a pain pill, which in turn prolongs the withdrawal.

Claimant's most severe pain is located in his lower hip area and radiates down his left leg into his knee. (R. 55). He also experiences pain in the back of his neck and through his entire spine. *Id.* Claimant has pain with bending, turning, and squatting due to his back problems, which precludes him from doing his previous construction work. (R. 57, 63). Claimant's pain is constant and, on a scale from zero to ten with 10 being suicidal and zero being no pain at all, he rated his pain a seven on a good day and an eight to nine on a bad day. (R. 58). On bad days, Claimant tries to manage his pain by finding a comfortable position in which to sit and relax. *Id.* He used to take pain medication, but can no longer do so because it is ineffective and was making him sick. *Id.* Now he has mostly bad days and stays in his home unable to do most anything. (R. 60).

Claimant experiences depression and as a result has difficulty focusing, memory problems, and he worries about his health, his inability to provide for his son, and his mother's health. (R. 60-61). Claimant has insomnia and has tried several medications, but none work well and he sleeps at most a total of two hours a night in intervals of 15-20 minutes, which leaves him mentally and physically fatigued. (R. 61). Claimant also experiences migraine headaches several times a week

6

that can last for hours and sometimes he seeks treatment in the emergency room as a result. (R. 64). Claimant has visited the emergency room multiple times related to his back pain, headaches, and withdrawal. (R. 64-65).

Claimant's daily activities are limited to watching television, sitting around the house, and talking to his mother. (R. 53). He cannot afford to go anywhere, but sometimes walks outside with his son until he wears out, which is generally within 30 minutes to two hours. *Id.* Claimant does not believe he could stand or walk for two hours at a time in a work situation, due to other demands that would be involved such as lifting or carrying. (R. 53-54). Claimant was told not to lift over ten pounds by his doctor. (R. 54).

## C.    Dr. Pearsall's Testimony at the Administrative Hearing

Dr. L. Dixon Pearsall, a vocational expert ("VE"), appeared and testified on behalf of Claimant at the administrative hearing. (R. 65-76). At the request of Claimant's attorney, Dr. Pearsall met with Claimant to review his vocational history, medical records, and medical limitations. (R. 66). Dr. Pearsall interviewed but did not test Claimant. (R. 70). Claimant's attorney posed the following hypothetical to Dr. Pearsall:

[A]ssume for the purposes of this question that this gentleman has significant limitations with his -- with -- with problems with back pain; that by recommendation of his physicians, he should lift no more than 10 pounds; that he has migraine headaches that can last as long as -- they can last for up to hours and up to three times a week. He also has significant problems with with [sic] medical withdrawal from prescription medications, specifically pain killers that he is taking for back pain; that his primary pain is in his hips, radiating to his legs at times; and has significant limitation of range of motion in his hips and lower back; that in addition to that, he's markedly limited in his ability to focus and concentrate; that he has significant difficulties in changing positions, moving around, squatting, and lifting his legs . . . that he has significant problems with memory as well as concentration, persistence, and pace.

7

. . . .

My question to you, Doctor, is given those -- the limitations that I have listed there from his medical reports and also from your own examination or own interview with Mr. Callahan, in your opinion, are there other jobs other than his past relevant work in the national economy that exist in significant numbers which he can perform?

(R. 67). Dr. Pearsall responded that the 10-pound lifting restriction alone would limit the individual to sedentary work. (R. 68). He further opined that, from a vocational perspective, the most limiting factor would be the marked limitation in focus and concentration, which translates to marked problems focusing for one-third to two-thirds of the workday, and such a limitation would eliminate all employment at any level. (R. 69). Dr. Pearsall noted that if the migraine headaches took the individual off task for even five to ten percent of the work week it would also eliminate all employment. *Id.* Dr. Pearsall also indicated that if the individual were of low average intelligence he would be restricted to unskilled work and that there is very little, less than one percent, unskilled sedentary work in the United States economy. (R. 71). Dr. Pearsall stated that a Global Assessment of Functioning ("GAF") score of 60 to 70 would not preclude unskilled sedentary work, but a GAF score of 50 to 55 would preclude employment because such an individual would not be sufficiently in contact with reality to engage in substantial gainful activity. (R. 71-72). Dr. Pearsall found it highly unlikely that the hypothetical individual could be placed in a job, particularly on a long-term basis. (R. 72-73). Finally, Dr. Pearsall reviewed certain medical opinions from Southeast Health Care regarding Claimant and opined that an individual so limited would be precluded from all work. (R. 73-76).

## V. DISCUSSION

Claimant alleges the ALJ erred by (1) failing to evaluate Claimant's depression and failing

8

to make findings of any nonexertional limitations relative to this disorder; (2) failing to evaluate Claimant's back injury under Listing 1.04; and (3) failing to properly consider the medical opinions. Pl.'s Mem. at 13-25.

**A.     The ALJ's Evaluation of Claimant's Depression and Related Nonexertional Limitations**

Claimant first contends that the ALJ failed to evaluate Claimant's depression and to make findings of any nonexertional limitations relative to this disorder. Pl.'s Mem. at 13-18. Specifically, Claimant contends that the ALJ improperly rejected medical opinions finding Claimant moderately restricted in the four functional domains, made no findings of nonexertional limitations despite finding Claimant's depression was a severe impairment, failed to consider and explain relevant evidence related to Claimant's mental impairments, and erred in utilizing the medical-vocational rules (the "grids"). *Id.* The Commissioner contends that the ALJ did in fact impose nonexertional limitations due to Claimant's mental impairments by limiting him to unskilled work. Def.'s Mem. [DE-40] at 11-13. The court agrees that the ALJ properly considered Claimant's depression in formulating the RFC and by imposing a limitation to unskilled work.

At step-two of the sequential evaluation the ALJ determined that Claimant's depression was severe. (R. 33). However, the ALJ determined that Claimant's mental impairment did not meet or medically equal a listing, and specifically addressed Listing 12.04, Affective Disorders. (R. 34). The ALJ found that Claimant has no restrictions in his activities of daily living, mild restrictions in social functioning, mild-to-moderate restrictions maintaining concentration, persistence or pace, and no episodes of decompensation of an extended duration, providing specific reasons for these conclusions. *Id.* The ALJ also discussed Claimant's depression in determining Claimant's RFC and concluded that "a limitation to unskilled work more than accommodates claimant's depression." (R.

9

### i. ALJ's Consideration of State Agency Consultants' Findings Regarding Nonexertional Limitations

Claimant first points out that two of the evaluating physicians assessed Claimant with moderate limitations in three of the four functional domains and argues the ALJ failed to explain his rejection of these opinions. Pl.'s Mem. at 13-14, n.18. However, these State Agency physicians ultimately concluded that Claimant was capable of simple, routine, repetitive tasks in a low-stress setting with minimal social demands. (R. 103, 118). Furthermore, a DDS evaluator performed a comprehensive clinical psychological evaluation of Claimant on January 2, 2010, and concluded as follows:

[Claimant] appears capable of understanding instructions adequately to perform simple, routine, and repetitive tasks. He demonstrates adequate social skills and the ability to interact appropriately with others. He may have some trouble concentrating at times. He appears to have some trouble with memory and this may need further testing. . . . Provided abstinence from mood altering substances continues, I believe judgment and math ability are adequate for managing benefits appropriately in his best interest.

(R. 579).

A limitation to unskilled work has been found equivalent to simple, routine, repetitive tasks. *See Scott v. Colvin*, No. 1:12-CV-170-RJC, 2013 WL 3927607, at \*6 (W.D.N.C. July 29, 2013) (citing cases finding that a limitation to simple, routine, repetitive work is equivalent to a limitation of unskilled work); 20 C.F.R. §§ 404.1568(a), 416.968(a) (defining "unskilled work" as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."); SSR 96-9p, 1996 WL 374185, at \*9 (listing mental activities required for unskilled work: understanding, remembering, and carrying out simple instructions; making simple work-related

10

decisions; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting). The ALJ limited Claimant to unskilled work due to his depression (R. 40), which is consistent with the limitations offered in the opinions on which Claimant relies. *See Love-Moore v. Colvin*, No. 7:12-CV-104-D, 2013 WL 5350870, at *2 (E.D.N.C. Sept. 24, 2013) (concluding the ALJ's failure to consider a physician's opinion was harmless error where physician's opinion was consistent with the ALJ's RFC determination); *Johnson v. Astrue*, No. 4:06-CV-00274-FL, 2008 WL 704321, at *11 (E.D.N.C. Mar. 14, 2008) (finding limitation imposed by ALJ to performing "unskilled simple, routine, repetitive, tasks due to her depression" was appropriate where the claimant was found to have moderate difficulties in maintaining concentration, persistence, or pace, was only mildly limited in performing activities of daily living and maintaining social functioning and would have moderate limitations in her ability to complete a normal workday and workweek due to her psychological symptoms). Thus, any error in this regard was harmless.

## ii. ALJ's Consideration of Claimant's Depression in RFC Determination

Next, Claimant contends that the ALJ failed to make any analysis or find any functional limitation beyond the step two and three analyses despite substantial evidence of Claimant's diminished capacity to work as a result of his depression. Pl.'s Mem. 14-16. To the contrary, in formulating the RFC the ALJ dedicated more than a page to the discussion of Claimant's depression (R. 37-39) and, as discussed above, limited Claimant to unskilled work, i.e., simple, routine, repetitive tasks, due to his depression (R. 40). Accordingly, this assertion of error is without merit.

## iii. ALJ's Consideration of Other Evidence

Claimant also cites evidence related to his mental impairments that he contends the ALJ

11

Case 7:13-cv-00132-RJ   Document 41   Filed 09/29/14   Page 11 of 25

failed to consider, such as his treatment with Allied Behavioral Management (R. 1085-1113) and his GAF scores, and also takes issue with the ALJ's statement relating Claimant's depression to his addiction to prescribed narcotics (R. 39). As the Commissioner points out, and the ALJ noted, Claimant himself reported that his depression was made worse by his addiction to opiates. (R. 38, 595). Further, the ALJ found that when Claimant sought mental health treatment it was related to his addiction, citing Claimant's self-admission to the hospital in September 2008 and several hospital visits in early 2009 for Methadone withdrawal. (R. 37) (citing Ex. 10F (R. 635-848)). Claimant does correctly note that the ALJ erred in stating Claimant only underwent one initial assessment at Allied Health when the record indicates that Claimant was treated there on an almost monthly basis from August 2010 to June 2011. (R. 1085-1113). However, Claimant fails to demonstrate how this error materially impacts the ALJ's evaluation of his mental impairments and RFC determination where, as noted above, the ALJ limited Claimant to unskilled work due to his depression consistent with medical opinions offered in this case. "Absent a showing of prejudice, an error by an ALJ is harmless." *Hooker v. Colvin*, No. 5:11-CV-243-FL, 2013 WL 1246742, at *2 (E.D.N.C. Mar. 26, 2013) (citing *Camp v. Massanari*, 22 F. App'x 311 (4th Cir. 2001)(citing *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000)); *Austin v. Astrue*, No. 7:06-CV-00622, 2007 WL 3070601, *6 (W.D.Va. Oct. 18, 2007)).

The ALJ also discussed the psychological evaluation David Johnson performed in January 2010, treatment notes from April, May, and August of 2010, and a hospital visit in August 2010 when Claimant reported doing fairly well psychologically and wanting to stop pain medication, but was discharged because he did not want to continue detox. (R. 38). The ALJ is not required to discuss every piece of evidence, and the ALJ's discussion of Claimant's depression here is sufficient

12

for the court to understand and meaningfully review the Commissioner's decision. *See Reid v. Comm'r of Soc. Sec.*, — F.3d —, 2014 WL 4555249, at *3-4 (4th Cir. July 2, 2014) (citations omitted).

With respect to Claimant's GAF scores, the ALJ acknowledged that at various times Claimant was assigned GAF scores of 40, 48, 55, and between 60-70. (R. 38). The GAF scale ranges from zero to one-hundred and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed. 1994).[2] The Social Security Administration takes the position that GAF scores do not "have a direct correlation to the severity requirements in [the social security] mental disorders listings." *Wiggins v. Astrue*, No. 5:11-CV-85-FL, 2012 WL 1016096, at *8 (E.D.N.C. Feb. 2, 2012) (internal quotation marks and citations omitted) (memorandum and recommendation concluding that the ALJ properly evaluated a claimant's bipolar disorder and mental retardation, even though he did not explicitly mention each individual GAF score in the record), *adopted by* 2012 WL 1016055 (E.D.N.C. Mar. 22, 2012). Even so, the ALJ must consider a claimant's GAF score along with all of the record evidence. *Atkinson v. Astrue*, No. 5:10-CV-298-FL, 2011 WL 3664346, at *11 (E.D.N.C. July 20, 2011), *adopted by* 2011 WL 3664858 (E.D.N.C. Aug. 17, 2011) (citations omitted). It is evident from the ALJ's opinion that he did in fact consider Claimant's GAF scores along with related treatment notes in evaluating how Claimant's depression impacted the RFC. (R. 38). Accordingly, this assertion of error lacks merit.

---

[2] It is noteworthy that the GAF scale was dropped from the DSM-V due, in part, to its "conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) . . . ." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 16 (5th ed. 2013).

13

### iv. ALJ's Reliance on the Grids

Claimant lastly contends, citing *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989), that the ALJ erred in relying on the grids, specifically arguing that VE testimony is required where the sedentary job base is eroded by nonexertional limitations. Pl.'s Mem. at 17-18. However, in *Walker* the Fourth Circuit recognized that "not every nonexertional limitation or malady rises to the level of a nonexertional impairment, so as to preclude reliance on the grids." 889 F.2d at 49 (citing *Grant v. Schweiker*, 699 F.2d 189 (4th Cir.1983)). The limitation to simple, routine, repetitive tasks, or unskilled work, has been found not to so erode the sedentary job base so as to preclude reliance on the grids. *See Scott*, 2013 WL 3927607, at \*6 (finding "'limitation to simple, unskilled, entry level work that allows for less stress work without public contact or significant interaction with others would not significantly erode the occupational base represented by the Grids.'") (citation omitted); *Eason v. Astrue*, No. 2:07-CV-00030-FL, 2008 WL 4108084, at \*16-17 (E.D.N.C. Aug. 29, 2008) (finding no error in ALJ's reliance on the grids where the ALJ found Claimant capable of the mental activities required by unskilled work—understanding, remembering and carrying out simple instructions and making simple work-related decisions); SSR 96-9p, 1996 WL 374185, at \*3 ("[T]he rules in Table No. 1 in appendix 2 take administrative notice that there are approximately 200 separate unskilled sedentary occupations, each representing numerous jobs, in the national economy."). Accordingly, the ALJ did not err utilizing the grids.

In sum, the court finds that the ALJ properly considered Claimant's mental impairments and sufficiently explained his determination in limiting Claimant to unskilled work, and the ALJ's determination in this regard is supported by substantial evidence.

14

## B. The ALJ's Evaluation of Listing 1.04

Claimant contends that the ALJ failed to evaluate Claimant's back injury under Listing 1.04. Pl.'s Mem. at 18-22. The Commissioner counters that the ALJ's listing analysis at step three is supported by substantial evidence. Def.'s Mem. at 13-16. The court finds that the ALJ considered Claimant's back injury under Listing 1.04, that any error in doing so is harmless, and Claimant has failed to carry his burden to show that his back injury meets or equals Listing 1.04.

To show disability under the listings, the claimant may present evidence either that the impairment meets or is "medically equivalent" to a listed impairment. *See Kellough v. Heckler*, 785 F.2d 1147, 1152 (4th Cir. 1986); *see also* 20 C.F.R. §§ 404.1526, 416.926 (regulations for determining medical equivalence). "For a claimant to qualify for benefits by showing that his . . . combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (emphasis in original). "The [ALJ] . . . is responsible for deciding . . . whether a listing is met or equaled." SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996). In order to determine whether a medical impairment equals a listing, the ALJ is bound to "consider all evidence in [claimant's] case record about [the] impairment(s) and its effects on [claimant] that is relevant to this finding. . . . [The ALJ] also consider[s] the opinion given by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. §§ 404.1526(c), 416.926(c). "Plaintiffs bear the burden of proving their condition meets a listing and, accordingly, the responsibility of producing evidence to sustain their claims." *Rowe v. Astrue*, No. 5:07-CV-478-BO, 2008 WL 4772199, at *1 (E.D.N.C. Oct. 28, 2008) (citing *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995)). Thus, where a claimant "fails to articulate why her medical

15

impairments do, in fact, meet all of the elements of a given listed impairment," she fails to meet her

burden. *Id.* (citing *Sullivan*, 493 U.S. at 530).

> Listing 1.04A[3] provides as follows:
>
> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

C.F.R. § 404, Subpt. P., App. 1, § 1.04A.

Here, the ALJ determined that "[t]he claimant's disc disease does not meet the Listing, because there is no evidence that it is characterized by nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis." (R. 34). The Commissioner does not appear to contest that there is in fact evidence in the record of lumbar spinal stenosis, but rather contends that Claimant has failed to identify evidence that his condition satisfies the other elements of the listing. Def.'s Mem. at 13-14. While Claimant is correct that evidence in the record indicates the presence of both nerve root compression and lumbar spinal stenosis (R. 297, 401-02, 608), the record does not support that all requirements of Listing 1.04 are met.

Claimant concedes, and the evidence shows, that his most recent straight-leg raising tests were negative (R. 305 (Jan. 2004); R. 530 (Oct. 2008); R. 371 (Jan. 2009); R. 582 (Jan. 2010)) with the only positive test occurring in 2001 (R. 307) several years before the alleged onset date. This

---

[3] It appears Claimant's argument is limited to Listing 1.04A, where he does not discuss the requirements for Listing 1.04B and 1.04C. Pl.'s Mem. at 20 n.32.

16

alone precludes a finding that Claimant's back injury meets Listing 1.04A. However, Claimant urges that the ALJ should have considered whether Claimant's impairments–specifically his "radicular pain symptoms . . . and any motor, sensory or reflex loss [which] would be consistent with his restless leg syndrome," the fact that surgery was recommended, and Claimant's progressive decline in back functioning coupled with his nonexertional limitations–equaled Listing 1.04A. Pl.'s Mem. at 20.

Contrary to Claimant's assertion, the medical records indicate that, despite Claimant's back injury, he consistently demonstrated normal motor and sensory function, reflexes, strength, and range of motion. (R. 721 (Apr. 2008 - no motor or sensory deficits, no extremity tenderness, full range of motion in all extremities); R. 745, 758 (Nov. 2008 - same); R. 767, 773, 778 (Dec. 2008 - same); R. 817 (April 2009 - same); R. 983 (Aug. 2010 - same); R. 1068 (June 2011 - same). *See Fields v. Astrue*, No. 5:10-CV-463-FL, 2011 WL 6019902, at *10 (E.D.N.C. Nov. 3, 2011) (finding no error in ALJ's conclusion that claimant's condition did not meet or equal Listing 1.04A where medical records failed to demonstrate motor loss, indicated good motor strength in the bilateral upper and lower extremities, and positive straight-leg raising tests were negative), *adopted by* 2011 WL 6019951 (E.D.N.C. Dec. 2, 2011).

Moreover, although surgery may have been recommended, Claimant has declined surgical intervention. When considered along with the above-mentioned relatively normal examination findings, the fact that Claimant has opted for conservative treatment in lieu of surgery may constitute evidence that his condition is not as disabling as alleged. *See Farrior v. Astrue*, No. 7:10-CV-164-FL, 2011 WL 3157150, at *5 (E.D.N.C. July 26, 2011) (finding no error in the consideration of claimant's election of more conservative treatment as a factor tending to show that

17

the claimant's subjective complaints are not fully credible); *Viverette v. Astrue*, No. 5:07-CV-395-FL, 2008 WL 5087419, at \*2 (E.D.N.C. Nov. 24, 2008) (finding that "when considered with other information, the routine nature of a course of treatment may indicate that a condition is not as severe as a plaintiff's subjective complaints may otherwise indicate.").

Finally, as discussed above, the ALJ adequately considered Claimant's depression and stated at step three that Claimant "does not have an impairment or *combination of impairments* that meets or medically equals the severity of one of the listed impairments . . . ." (R. 33) (emphasis added). The ALJ's statement that he considered Claimant's impairments in combination is entitled to weight absent evidence to the contrary. *See Reid*, 2014 WL 4555249, at \*4 ("The Commissioner, through the ALJ and Appeals Council, stated that the whole record was considered, and, absent evidence to the contrary, we take her at her word.") (citation omitted). Accordingly, Claimant has failed to carry his burden of showing that his back injury meets or equals Listing 1.04A, and as a result any error in the ALJ's analysis was harmless.

## C.     The ALJ's Evaluation of the Medical Opinion Evidence

Claimant contends that the ALJ failed to properly consider the medical opinion evidence in this case, specifically that the ALJ (1) failed to explain why he rejected the findings of the State Agency consultants regarding Claimant's restrictions in the functional domains, (2) failed to analyze Claimant's treatment with Dr. George Scontsas, his GAF scores, or his low-functioning for the year pre-dating his therapy, and (3) failed to explain why he discounted the opinion of Amy Ransom, P.A. Pl.'s Mem. at 22-25. The Commissioner contends that the ALJ's analysis of the opinion evidence is supported by substantial evidence. Def.'s Mem. at 16-20. The court finds that the ALJ properly evaluated the medical opinion evidence and the weight he attributed to these opinions is supported

18

by substantial evidence.

Regardless of the source, the ALJ must evaluate every medical opinion received. 20 C.F.R. §§ 404.1527(c), 416.927(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Additionally, more weight is generally given to opinions of treating sources, who usually are better able to provide "a detailed, longitudinal picture" of a claimant's alleged disability, than non-treating sources, such as consultative examiners. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Though the opinion of a treating physician is generally entitled to "great weight," the ALJ is not required to give it "controlling weight." *Craig*, 76 F.3d at 590 (quotations & citations omitted). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Id.*; *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (stating "[t]he ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence"); *Mastro*, 270 F.3d at 178 (explaining "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence") (citation omitted).

If the ALJ determines that a treating physician's opinion should not be considered controlling, the ALJ must then analyze and weigh all of the medical opinions in the record, taking into account the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist. *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). While an ALJ is under no obligation to accept any medical opinion, *see Wireman v.*

19

*Barnhart*, No. 2:05-CV-46, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5, 2006), he must nevertheless explain the weight accorded such opinions. *See* SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); SSR 96-6p, 1996 WL 374180, at *1. An ALJ may not reject medical evidence for the wrong reason or no reason. *Wireman*, 2006 WL 2565245, at *8. "In most cases, the ALJ's failure to consider a physician's opinion (particularly a treating physician) or to discuss the weight given to that opinion will require remand." *Love-Moore*, 2013 WL 5350870, at *2 (citing *Hill v. Astrue*, 698 F.3d 1153, 1159-60 (9th Cir. 2012); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747, 750 (6th Cir. 2007); *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006)). However, "[i]n some cases, the failure of an ALJ to explicitly state the weight given to a medical opinion constitutes harmless error, so long as the weight given to the opinion is discernible from the decision and any grounds for discounting it are reasonably articulated." *Bryant v. Colvin*, No. 5:11-CV-648-D, 2013 WL 3455736, at *5 (E.D.N.C. July 9, 2013) (citations and quotations omitted).

### i. ALJ's Consideration of the State Agency Opinions

Claimant first contends that the ALJ failed to explain why he rejected the consulting opinions of the State Agency physicians that Claimant had moderate limitations in three of the four functional domains. However, as explained above, these State Agency physicians ultimately concluded that Claimant was capable of simple, routine, repetitive tasks in a low-stress setting with minimal social demands, consistent with the ALJ's limitation of Claimant to unskilled work. (R. 40, 103, 118). *See Love-Moore*, 2013 WL 5350870, at *2 (concluding the ALJ's failure to consider a physician's opinion was harmless error where physician's opinion was consistent with the ALJ's RFC determination). Accordingly, any error in the ALJ's failure to explain his rejection of these opinions is harmless.

20

## ii. ALJ's Consideration of Evidence Related to Claimant's Treatment with Dr. Scontsas

Next, Claimant contends the ALJ failed to analyze Claimant's treatment with Dr. George Scontsas, including Dr. Scontsas' opinions, the GAF scores he assigned to Claimant, or Claimant's low-functioning during the year pre-dating his therapy. In support of this contention, Claimant cites Dr. Scontsas' treatment notes spanning from September 2010 to June 2011. (R. 1085-1113). The term "medical opinion" is defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R.§§ 404.1527(a)(2), 416.927(a)(2). Thus, a group of treatment notes such as those from Dr. Scontsas cited by Claimant, are not in and of themselves "medical opinions." *See Love-Moore v. Colvin*, No. 7:12-CV-104-D, 2013 WL 5366967, at *11 (E.D.N.C. Aug. 30, 2013) (memorandum and recommendation distinguishing between treatment notes and medical opinions), *adopted by* 2013 WL 5350870 (E.D.N.C. Sept. 24, 2013). While treatment notes may contain medical opinions, Claimant fails to direct the court to any specific medical opinion by Dr. Scontsas within the group of documents cited. Additionally, while Claimant notes that his functioning was "much lower" for the year pre-dating his therapy with Dr. Scontsas, the fact that Claimant's condition improved with treatment does not support his claim. Finally, as discussed above, the ALJ did not err in his treatment of the GAF score evidence. Therefore, the court finds these arguments without merit.

## iii. ALJ's Consideration of Amy Ransom's Opinions

Lastly, Claimant contends that the ALJ failed to adequately explain why he discounted two

21

opinions of Amy Ransom, P.A. from April 26 and June 23, 2010 (R. 624-25, 628-29). The ALJ

discussed these opinions as follows:

> The claimant was initially evaluated by Ms. Amy Ransom in April 2010, and after his initial evaluation for depression, Ms. Ransom opined that the claimant suffers from complex conditions which include chronic pain and subsequent narcotic addiction, and major depression. Therefore, she felt that he was not able to maintain gainful employment due to these problems. However, she then noted that the claimant would be able to attend training classes, sit, and walk for up to four hours a day, standing for two hours, and lift and carry up to 10 pounds. (Exhibit 9F/41). This opinion has been evaluated, but has been given little weight. Ms. Ransom is not a medical physician. Further, her opinion was based on one initial meeting with the claimant, and her opinion is therefore based largely on the claimant's subjective complaints. Further, Ms. Ransom's opinion is contradictory, in that she initially stated that he cannot sustain any employment, but later notes that he can attend training classes, sit, and walk for up to four hours a day, standing for two hours, and lift and carry up to 10 pounds.

> In June 2010, Ms. Ransom again opined that the claimant cannot maintain any gainful employment. (Exhibit 9F/39). This opinion has been considered, but has been given no weight as Ms. Ransom failed to note any objective findings consistent with her opinion.

(R. 39-40).

Pursuant to the regulations, physicians' assistants are not considered acceptable medical

sources. *See* 20 C.F.R. §§ 404.1513(a), 416.913(a) (defining "acceptable medical sources" as

licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists,

and qualified speech-language pathologists). Instead, a physicians' assistant qualifies as an "other

source," whose opinion is entitled to "significantly less weight." *See Craig*, 76 F.3d at 586; 20

C.F.R. §§ 404.1513(d)(1), 416.913(d)(1). In fact, SSR 06-03p provides that "only 'acceptable

medical sources' can give us medical opinions" or "be considered treating sources . . . whose

medical opinions may be entitled to controlling weight." 2006 WL 2329939, at \*2 (Aug. 9, 2006)

(citing 20 C.F.R. §§ 404.1527(a)(2), (d); 416.927(a)(2), (d)). Nonetheless, "evidence from other

sources," such as physicians' assistants, may be used "to show the severity of [a claimant's] impairment(s) and how it affects [a claimant's] ability to work . . . ." 20 C.F.R. §§ 404.1513(d), 416.913(d). Since medical sources, such as physicians' assistants, "have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians . . . [o]pinions from these medical sources . . . are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p, 2006 WL 2329939, at *3. Indeed, "depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." *Id.*

Claimant argues that the fact that Ransom is not a medical physician does not mean her opinions should be given no weight. The ALJ gave Ransom's April 2010 opinion "little weight" noting, among other reasons, that she was not a medical physician. (R. 39). Whether Ransom is an "acceptable medical source" is an appropriate, and quite necessary, consideration in correctly weighing opinion evidence under the regulations. The ALJ also discounted this opinion because it was based on only one meeting with Claimant. The longitudinal relationship between the source and Claimant is likewise an appropriate consideration in evaluating opinion evidence. 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i). The ALJ finally noted that Ransom's opinion that Claimant could not work was inconsistent with her findings that Claimant could attend training classes for two to four hours daily, sit for four hours, stand for two hours, and walk for two to four hours. While Claimant asserts that these limitations do not equate with being able to work a full day, they likewise are not consistent with a person who "has significant physical and mental disability and is not

23

expected to return to work/recover," as opined by Ransom (R. 627), and it was the ALJ's responsibility to weigh and resolve such contradictions. *See Faust v. Colvin*, No. 5:13-CV-364-FL, 2014 WL 4636988, at \*3 (E.D.N.C. Sept. 16, 2014) ("'While the [Commissioner] is empowered . . . to resolve evidentiary conflicts, the [Commissioner], through the ALJ, is required to explicitly indicate the weight given to all relevant evidence.'") (internal quotation marks and citation omitted) (quoting *Murphy v. Bowen*, 810 F.2d 433, 437 (4th Cir. 1987)). The ALJ gave "specific and legitimate reasons" for assigning little weight to Ransom's opinion and, therefore, was "was permitted to reject the . . . opinion in its entirety." *Bishop v. Comm'r of Soc. Sec.*, No. 14-1042, 2014 WL 4347190, at \*2 (4th Cir. Sept. 3, 2014) (citations omitted).

With respect to Ransom's June 2010 opinion, which simply stated that Claimant "can not maintain any gainful employment" the ALJ gave it no weight because it was unsupported by objective findings. (R. 40, 625). The supportability of an opinion is an appropriate consideration in weighing medical opinion evidence. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). Further, while Claimant points out that Ransom's later opinion was informed by four examinations of Claimant (R. 592-601), the court finds under the circumstances presented here that a two-month treatment relationship is not sufficiently significant to outweigh the total absence of explanation or support for this opinion. Moreover, Ransom's opinion amounts to a legal conclusion on an issue reserved to the Commissioner and lacks statements "about the nature and severity of [plaintiff's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [plaintiff] can still do despite impairment(s), . . . and [plaintiff's] physical or mental restrictions." *Stokley v. Colvin*, No. 7:13-CV-110-FL, 2014 WL 4701928, \*4 (E.D.N.C. Sept. 22, 2014) (quoting 20 C.F.R. § 404.1527(a)(2)). Accordingly, the ALJ did not err in weighing Ransom's opinions.

24

## VI. CONCLUSION

For the reasons stated above, Claimant's Motion for Judgment on the Pleadings [DE-34] is

DENIED, Defendant's Motion for Judgment on the Pleadings [DE-39] is ALLOWED and the final

decision of the Commissioner is UPHELD.

SO ORDERED, this the 29th day of September 2014.

Robert B. Jones, Jr.
United States Magistrate Judge